Housekeeping Judge Hamilton This is a matter of housekeeping. As I understand it, you and your co-counsel for the appellate are going to divide 10 and 10, is that right? That's correct, Judge. And are either of you going to try to reserve some rebuttal time? I am going to try to. Okay, all right. And you are Mr.? Hamilton. Hamilton, okay. Very well, please proceed. Good morning. May it please the Court. My name is Josh Hamilton. I am here today. I represent Fausto Velazquez in this appeal. I'd like, as I said, to reserve about two minutes and I will watch the clock. So the case against Fausto Velazquez was not nearly as strong as it was against the other co-defendants in this very interesting case. And the government knew that. And rather than allow the jury to make a reasoned decision as to guilt or innocence based upon a fair presentation of the real facts, the government overreached. And it overreached by injecting very prejudicial other act evidence into this case that had no place at all in it. In particular, we have the meth use, which was just completely peppered into the case by the government ad nauseam. It was discussed in the opening. It was discussed in the closing. It was discussed, I think, with four of nine total trial witnesses. And the way it was used, it wasn't used for any proper purpose. It wasn't connected with the case in any material way. It didn't provide any substantive or contextual nexus. It was just another bad act that they had done. And yet the government just continuously brought this issue up. The fact that they had used methamphetamine at one point during the sequence of events offered nothing to the story whatsoever. But yet that is what the government focused on. It didn't provide. Did you try the case? I did not. Was there an objection to this? There was. There was an objection to this specifically. But nevertheless, the way that it was used was just — wasn't to do anything other than to evoke a visceral reaction from the jurors. Did the government mention meth use in its closing? It did, yes. And the way that it did is telling, because it — the government had originally tried to say that the meth use was probative as to lack of nervousness or fear or also, I guess, absence of duress as it pertained to Ms. Carpenter. But the way that it was used wasn't even for that point. There was evidence that there was singing and rapping to music and joking about, which is far more probative to lack of nervousness or fear than the fact that they ingested methamphetamine. But the way the government used it was saying, these men — these people used methamphetamine while there's a person tied up sitting in the trunk of the car in the front of the house. In other words, these are terrible people. These are monstrous people, and you should use this information, as the government did highlight it during its closing. This is evidence of guilt. This is a bad thing they did. These are bad people. So if they'd been playing bridge inside the house while the guy was tied up, the government couldn't mention that? Well, that's certainly far more probative of — the meth had nothing to do with this case whatsoever. It had no place in it. It had nothing to do with the sequence of events. Playing bridge is not a bad act. It's not a crime. It's not a — something that evokes emotions in a jury the way that using drugs, particularly methamphetamine, does. But that wasn't even the only problematic evidence that the government relied upon in its case. What was even more troubling, and far more so, was the stolen marijuana theory. And that wasn't even presented by the government pre-trial as something that was going to come up in trial. They said, we need to provide context for the motive of what happened, what set this into — series of events into motion. And that was that the cartel in Mexico had perceived that the victim had stolen marijuana from them or was responsible, and there was a $50,000 bounty on his head. And yet at trial, what the government focused on was that — put on a veritable mini-trial on the issue that my client actually stole the marijuana. And that was something that, first of all, just plainly not true, but there is no evidence to support that it was. It was just baseless conjecture, unsourced hearsay. It was literally word on the street. And yet the government highlighted this ad nauseam during its closing argument and specifically said, bad things happen when you steal marijuana from the cartel. In other words, they're making — again, there's no evidence that this actually happened. It's word on the street. It's — it has no foundation. It's highly speculative. And yet the government is arguing as though it's gospel truth, and furthermore, it makes the client seem as though he is an absolute monster. Not only is he a thief, not only is he a liar, not only is a master manipulator that would put this entire sequence of events into play, but he is somebody who would set up his own best friend and deliver him to an uncertain fate at the hands of the cartel in Mexico for something that he had himself done. And that is evidence that the district court didn't even conduct any gatekeeping function for, because the government pre-trial had said it does — beside the point who stole it or if it was even stolen at all. All that matters is that the perception was the cartel believed. Your client was involved in placing this individual in the trunk, right? No, he wasn't. No. The evidence from the government was that my client was never present. As far as the actual kidnapping itself, he wasn't ever even involved in it. And yet that is another problematic aspect of this case, is that the district court failed to instruct the jury that when Ms. Carpenter testified and her out-of-court statement to the FBI was introduced by the government, which directly implicated my client. So the jury was never told that it was needed to disregard that evidence as it pertained to my client. And yet that evidence was also highlighted by the government during its closing argument. And the law in this circuit is that when a — in a joint trial, when a co-defendant's out-of-court statement is introduced, the district court has a sua sponte obligation to instruct the jury that it is to disregard the out-of-court statement that directly implicates the non-testifying defendant, in this case my client. And yet that didn't happen in this case. So to kind of get back to what I think Your Honor was getting at, the quantum of proof against my client was weak. It was far from overwhelming. And yet the strongest evidence that was adduced against him at trial of his guilt was either wrongfully admitted or was per se inadmissible against him, and the jury was never told that it was needed and that it could apply solely to Ms. Carpenter. And I'd like to reserve the rest of my time, if I can. Roberts. Okay. Please do. Good morning. Good morning. My name is John Young. I represent Roxanne Carpenter. I know that I'm on the right track here with regard to sealing the offer of proof because the government refused to read my offer of proof. I've never had that happen before. But in this case, the government knew that it had no business reading that offer of proof. There was, I think, still prejudice, even though the prosecutor in this case didn't read the offer of proof. The NEF went out to every other attorney in the case. It went out to the attorney for the cooperating co-defendant, Brian Myers. It went out to the both attorneys for the material witness, Angel Gonzalez. So they had my offer of proof. And they were both part of the prosecution team. They were working hand-in-glove with the prosecution to convict my client. Every case agent in this case had access to it. Every other witness in this case had access to it. I would like to have had a trial where every other participant in the case did not know my every thought. Counsel, what case would you cite that you believe buttresses substantiates your position that an offer of proof of the nature in this case, offered in this case, needed to be under seal? I think my best case on that is Girola, Your Honor. And in the Girola case, the offer of proof needed to be sealed. It was sealed at the trial. In the Girola case, the offer of proof remained sealed on appeal, on direct appeal. And after the Girola case, the offer of proof remained sealed after the direct appeal when it was remanded back down to the district court for exactly these reasons. If we're going to have this Vasquez-Landover rule, if we're going to have this rule that's outside the rules of criminal procedure, then I think this needs to be clarified so that I don't know that there's anything here that's going to help my client. I don't know what the remedy could be, but I would like to straighten this out and maybe provide some guidance for the next time I've got a duress case. This rule outside the rules of criminal procedure, it's inconsistent with 12b-3, that motions must be made before trial. That's not Vasquez-Landover. The pretrial offer of proof and duress is not one of those rules. Let's talk for just a minute. I realize your point about the rules of criminal procedure, but is there a qualified First Amendment right of access or a common law right of access of the public to pretrial offers of proof? Generally speaking, things that are done in court are done on an open record and a when things need to be sealed, they do get sealed. I guess what I'm struggling with is, I know you said that you were required to put out your whole case, but eventually you would have to put this out in any event in order to convince a jury or a judge if that were the case, if you had a trial on the bench. I just, I'm not sure I understand why the public's interest doesn't overcome or is more important than your client's interest in maintaining secrecy in this matter. Well, the presumption here is the public has a right to know what's going on in court, but the public doesn't have a right to know what's going on in my mind or what's going on in my client's mind. The interactions between me and my client, all of the interviews that I do with my client, all of the investigation that I do in my case, all of my work product in my case, I spent many, many hours with my client interviewing her and determining what exactly had happened because it was very confusing what had happened. Once I had put that all together, I had to put that together, and this is not a notice of a defense, which is an entire – a notice of a defense is something very simple. It's just a one-line, this is what my defense is. This is an offer of proof, which is far more complete, far more thorough, because if I lose that offer of proof, that is my only record when I come before this Court. So I have put everything that I have got in my entire case, everything in my file, all of my interviews with my client, everything that I know about my case, I've now previewed to the – I understand it's going to come out at trial, but I would like for it to come out at trial. I would not like for it to come out pretrial. I don't want to preview it to everybody. I could preview it to the judge. Even then, I know a 12b-6 motion when I see one, and this feels a lot like a 12b-6 motion, and I'm back to talking about Vasquez-Landever. This isn't the vehicle for that, but the – it feels like – I can preview it to a judge outside of the presence of the prosecutor, outside of the presence of the co-defendants, outside of the presence of the material witnesses, but I don't want for everybody to know what I'm doing days or weeks in advance before I get to trial and I start doing them. That's work product. Kennedy. What – what – what that is contained in your offer of proof do you believe falls within that, if you will, penumbra of secrecy that you believe is warranted in this case? Much of it's just standard kind of information that any good criminal defense lawyer would put on, right? I – I would put that on at trial, and I did put that on at trial. Right, right. But what's in the offer of proof that the government found out from my offer of proof or somebody found out from my offer of proof? So it's in Clerk's record at 106. My offer of proof was full of things that the alleged victim in this case did not tell the government. He did not tell the government that he stole marijuana from the cartel, and that's why he was in the trunk of the car. He blamed it on Roxanne Carpenter and her friends. He didn't – he didn't tell the government that he blamed the marijuana that he'd stolen on – on the bikers down the road, and that's why he was in the trunk of the car. I – I put in there that Fausto Zambi-Velasquez talked to the owner of the marijuana. Roxanne Carpenter, my client, had also talked to the owner of the marijuana. That cartel members had showed up at Roxanne Carpenter's house and put AK-47s to their heads at – at that house. These were things that Angel Gonzalez did not tell the – the – the prosecutor. These are – these are things that the prosecutor or – or the – the co-defendants So the government, in your view, did not know any of those things prior to the time that you provided this information? No, I – I don't think they did. And – and I – and I go on. Fausto Velasquez, while – while the gun was to his head, he called Angel Gonzalez. Angel Gonzalez did not tell the government that law enforcement appeared at – at Roxanne Carpenter's house unrequested, and – and Angel Gonzalez did not talk about that. There – there are a lot of things in that offer of proof that – that I put out there. I don't want to spend, because I – I don't – I don't know what the remedy would be in this case. I do want to touch on the Pinkerton issue. Can I just ask one question before you do? Yes. So the government says that it didn't read your offer of proof. Do you have any reason to question that? No, I believe them. Okay. I believe that they knew they had no business reading that offer of proof. Okay. And you also say that you were prejudiced because government witnesses could access the information. Do you have any evidence that government witnesses did access that? That – that would require a hearing, and their – their attorneys would need to be cross-examined or – or questioned about whether – it went out on the NEF to those attorneys. Angel Gonzalez was represented by two very competent attorneys, Chris Kilborn and Saul Huerta, two of our best. And so there's nothing in the trial record of – where anybody asked the witnesses if they had previously read your offer of proof? No. Nobody jumped up and said, well, I read it, Your Honor. But nobody was – But did you – did you ask them? No, I – I did not ask them. Okay. So this is pretty much a hypothetical issue then, right? Because we don't know of a single person that read your offer of proof. I know all of these attorneys. I'm positive they read it. There's – there's no question in my mind. They're very good attorneys, and they wanted to know what my case was about. They were – they were representing these people. I'm sure they knew what was in there. Okay. But as my colleague pointed out, there's nothing on the record that shows that they, in fact, did read it. You believe, based on your personal experience with them, that they must have done so. But as she points out, there's nothing on the record that shows that that was done, correct? I'm certain they read it. But there's nothing in the record that I could put my finger on where they said, yes, I read it. Okay. When did you find out it had been read by anyone outside of you and your client? Nobody's ever – it went out on NEF. I was forced to file it electronically so that it went to all of the attorneys. So I knew when I was filing it electronically that I had to do that, and that's where it was going. Well, I guess what I'm getting at is, during the course of the trial, did you have sufficient knowledge about the fact that this had come to light, the that you had done? Were you aware of that? I made the pretrial offer myself before trial, so I was aware it was made. Oh, you were in a position to cross-examine government witnesses who might have revealed testimony during the trial that related back to the pretrial offer, correct? I could have asked the government witnesses if their attorneys had relayed information to them. And you didn't. That would not have been pertinent to anything that the jury was deciding. It would have been more relevant to this issue of sealing the offer of proof or not sealing the offer of proof, but it would have been completely irrelevant to the determination at trial of the facts of the kidnapping. Other questions by my colleague? Your time is up, then, counsel. Thank you for your argument. Good morning, Your Honors. I'm Erica McCallum. I'm from the District of Arizona, and I'm here on behalf of the United States. I'd like to start briefly with counsel for Ms. Carpenter, the argument regarding the duress proffer. I think the case, Judge, that you asked about really is the Kamakana case, which talks about the presumption of public access to court proceedings unless there's a compelling reason for those proceedings to not be made public. And because it's a presumption, the defendant seeking sealing or ex parte consideration has to rebut the presumption. And I think what's clear here is that didn't happen. Also, what's also clear is it was harmless. The defendant was able to put on the duress defense at trial and received a duress instruction. And as this panel has noted this morning, there's no indication that anyone inappropriately accessed that information or used it inappropriate beyond defense counsel's speculation. So if there are — Well, from the government's perspective, then, the case law, as you view it, there's a, if you will, a presumption that an offer approved is to be public unless, in this case, the defendant makes a compelling argument why it should not be public. Is that correct? That's correct. And in this case, no such argument was made. That's also correct. And if there are no further questions on the Carpenter issues, then I would turn to the arguments that have been made on behalf of the Defendant Velazquez. First of all, actually, regarding both of the defendants in this case, looking at each of their issues raised on appeal, what none of them are able to overcome is the fact that there was abundant evidence in this trial, independent of any potential errors that took place. And so the evidence included texts between Velazquez and Carpenter, phone calls between Velazquez and the cartel. Velazquez's Google searches for translations for his communications with the cartel, as well as mapping information regarding crossing the port of entry into Mexico. So your argument, then, with respect to the meth, for example, is that even if there were some prejudice in that about prior bad acts, if indeed that's what it was entered for, the evidence is so overwhelming that it overcomes that. Is that the government's position? That is, in part. However, I'd also like to address the defense counsel's claim that there was all of this focus at trial on this one incident at Kerry Hall's house where the three defendants smoked meth. That's referenced, I believe, three times during testimony, and it's referenced, the government did reference that during its closing. However, this entire offense was rife with drug use. So if you go through and you toed up, you look at the numbers regarding references to drug use, meth, amphetamine, heroin, marijuana, during the course of the trial, the numbers you come up with is drug use by participants 41 times. That's by Carpenter's counsel during opening and closing, and also by the government during closing. In fact This is kind of de minimis, non curat lex, is it? Yes, exactly. In fact, part of the testimony was that Carpenter had given Myers, one of the actual kidnappers, $375 so that during the course of kidnapping the victim, they could also swing by Douglas, Arizona to pick up an ounce of methamphetamine. There's also testimony regarding the fact that Velazquez, in two different places in the trial, Velazquez had a gun. There's testimony that, oh, oh, and Velazquez himself, during his very first questions of Kerry Hall, asked about the drug use. So Velazquez himself elicited the drug use. Turning again to the missing marijuana, in his reply brief, Velazquez complains the real problem was the evidence at trial about who stole the marijuana. That was irrelevant. It shouldn't have been gone into. But if you look at page 46 on the fourth day of jury trial, Velazquez's counsel is cross-examining Brian Myers, and he's asking Myers, who stole the marijuana load? And Myers says, I don't know, but Velazquez told me that he turned it back over to the cartel. So my question is, why are we doing a kidnapping if the marijuana's been returned? So there's this exchange between Velazquez's counsel and Myers, where Myers says, all I know is I don't know where the weed actually went to. That's what I know. And counsel says, so that's a big, big question in this case, isn't it? And Myers says, I thought this case was about a kidnapping, not missing marijuana. And counsel says, it's about missing marijuana. Do you know where it went? And Myers says, I have no idea where the marijuana went. So Velazquez himself is eliciting this testimony, and consequently, it's pretty hard for him to be prejudicial to him when he's exploring it himself with the witnesses. If there are no further questions, I'd submit on my brief and ask you to affirm on all issues. Very well. Thank you. We have some rebuttal time, counsel. Thank you, Judge. A couple of points. The first is, there was not overwhelming evidence as to Mr. Velazquez's guilt. That is false. Let's talk about the cell phones, which the government just mentioned. There were some text messages and some Google searches. There was also ample proof that not every single one of these people involved had a phone and that they were all using each other's phones, which the government left out. It would be helpful to me, and I suspect to my colleagues, you just heard the government's counsel go through a litany of things that she ascribed to your client that she thinks were he brought up the drugs or there were other things that implicated him in the conspiracy. What specifically did she say that you believe is false, and where in the record would you cite to contradict what she said, with respect to your client? First of all, it's the government that kept bringing up the meth use. So the references of the meth were being elicited by the government. There was some instances... Let's say that... I'm asking you what she said that is not true. She tried to contradict that. She didn't say that the government didn't bring up the meth. She said that your client also brought up drugs, also brought up these other things that tied him to the conspiracy. What did she say that was false? The defendant subjected to the introduction of that evidence, and that was overruled. Then once it's coming out, they're cross-examining Carrie Hall about her own meth use in a false statement that she made. So they didn't want the evidence to come in at all. Then they have a duty, once it's coming in, to try to defend against it. But that's still not them highlighting it at all. That was one instance. The other thing is... I didn't hear her say highlight. Excuse me? I don't understand the question. Well, you've been asked what in government counsel's recitation of this business about introducing drug use was inaccurate, and you just said that she highlighted it. They didn't introduce evidence of drug use. They cross-examined. He said... Mr. Velasquez, did you try the case? I did not. Okay. So trial counsel for Velasquez, according to her, elicited testimony about drug use. Is that true or not? Cross-examined a witness about her own drug use, yes. Yeah. Okay. But he didn't highlight his own drug use, and that is what my issue is here today. So those two things are not congruent with one another. The other thing is about the missing marijuana. The government never addressed that issue at all in its briefs, period. And then finally, with respect to the... If you look at the entire picture of the case, the vast majority of the evidence that was adduced against my client was erroneously introduced, and it was either introduced as Matthews evidence, which really had no place in this trial, but more importantly, it was this entire mini-trial on the issue of the fact that he stole it. And that... There was no proper gatekeeping function. There is no question that this man was denied a fair trial. He deserves a new one, and I'd ask your honors to reverse and remand. Thank you, counsel. Any other questions by my colleague? Thanks to both all counsel, three counsel, the government. The case just argued is submitted, and the court stands in recess for the day. Thank you. Thank you.
judges: Hawkins, M. Smith Jr., Vratil